MARGARITA BARNHILL (Formerly Margarita Sanchez), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LOUIS M. SANCHEZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barnhill v. Commissioner
Docket Nos. 12567-78, 12568-78.
United States Tax Court
T.C. Memo 1983-375; 1983 Tax Ct. Memo LEXIS 413; 46 T.C.M. (CCH) 577; T.C.M. (RIA) 83375; June 23, 1983. *413 Ps resided in New Jersey, owned rental properties, and operated a gas station there. In 1969, they sold one of their properties, moved to Florida, and opened another gas station there. At the time of the sale of such property, Ps executed two false documents purporting to evidence loans to them. In 1970, Ps purchased properties in Florida and sold the other rental property in New Jersey. Ps failed to report certain items of income on their returns. H filed a separate return for 1971, and later pled guilty to tax evasion for such year under sec. 7201, I.R.C. 1954. Held:
(1) Ps are liable for a determined amount of deficiencies. (2) Part of the underpayment of tax for each year was due to fraud on the part of H. (3) The statute of limitations does not bar the assessment and collection of deficiencies. Sec. 6501(c)(1), I.R.C. 1954. (4) W is not entitled to be relieved of liability as an innocent spouse since she had reason to know of the omissions from income. *414 Jack R. Leonard and E. David Kemp, for the petitioners. Judy K. Hunt, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: *415 Addition to Tax
Sec. 6653(b)
Petitioner
Year
Deficiency
[1] I.R.C. 1954 Louis M. Sanchez and
1969
$12,368.01
$6,184.01
Margarita Barnhill
(formerly Margarita
1970
6,235.71
3,117.86
Sanchez)
Louis M. Sanchez
1971
6,579.13
3,289.57
The issues for decision are: (1) Whether the petitioners understated their taxable income in the amounts determined by the Commissioner through a net worth computation; (2) whether any part of the underpayment of tax was due to fraud on the part of Mr. Sanchez; (3) whether the assessment of deficiencies in income taxes and additions thereto is barred by the statute of limitations; and (4) whether the petitioner Margarita Barnhill is entitled to relief from liability for the deficiencies as an innocent spouse under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are *416 so found. The petitioners, Margarita Barnhill and Louis M. Sanchez, formerly husband and wife, resided separately in Orlando, Fla., at the time they filed their petitions in this case. They filed joint Federal income tax returns for 1969 and 1970. Their return for 1969 was filed with the Internal Revenue Service Center, Philadelphia, Pa., and their return for 1970 was filed with the Internal Revenue Service Center, Chamblee, Ga. Mr. Sanchez filed an individual Federal income tax return for 1971 with the Internal Revenue Service Center, Chamblee, Ga. Mr. Sanchez will sometimes be referred to as the petitioner, and Mrs. Barnhill will be referred to by that name throughout the opinion even though she may have been known as Mrs. Sanchez at the time of the occurrence of some of the events. Mr. Sanchez was born in Cuba. In 1959, after completing high school, he emigrated to the United States and enrolled in the Edison School in New York City. After a few months, he left school and went to work. Margarita Barnhill (nee Martinez) was also born in Cuba. However, she came to the United States as an infant and grew up in New York City, where she completed secondary school. On December 29, 1962, the *417 petitioners were married. They received as wedding gifts approximately $2,000 in cash, which they deposited in a bank account at the Lincoln Savings Bank in New York. At such time, the petitioners maintained another bank account at the First National Bank of Jersey City. In 1963, Alejandrina Ciebeiro, the sister of Mr. Sanchez, came to the United States from Cuba to visit her daughter. At such time, Mrs. Ciebeiro gave the petitioners some money which she had brought with her from Cuba. Between 1962 and 1964, Mrs. Barnhill worked as a secretary for Mitsubishi International Corporation in New York City. In May 1964, a son was born to the petitioners. Between 1960 and 1964, Mr. Sanchez worked in a variety of positions; he painted post office boxes, worked for One Hour Martinizing in Jersey City, and pressed clothes at Frank's Cleaners in West New York, N.J. In November 1964, Mr. Sanchez applied to Shell Oil Company for a dealership to operate a service station. On such application, he stated that he earned $325 per month at Frank's Cleaners, that he had $3,500 to invest in a dealership, and that he could raise between $2,000 and $3,000 of additional capital from his father-in-law. *418 On such application, Mr. Sanchez also stated that his assets included the following items: Cash on hand (including checking
account balance)
$ 300
Haven Savings and Loan acct. 26078
4,320
Lincoln Savings Bank acct. 27-243-80
500
Autos and trucks
1,000
Tools and equipment
50
Furnishings in apartment
2,000
$8,170
Mr. Sanchez further stated on such application that he had no liabilities and that his net worth was $8,170. The character credit report attached to such application indicated that Mrs. Barnhill was then employed as a secretary for the Lincoln Savings Bank earning approximately $69 per week. Such report further indicated that Mr. Sanchez was then living with his father-in-law in Brooklyn, N.Y. Such application was approved, and Mr. Sanchez acquired a Shell Oil dealership in Hoboken, N.J. Between 1964 and October 1969, he was the owner and operator of the Observer Shell Station, 425 Newark Street, Hoboken, N.J. (Observer Shell). Before commencing operations at the Observer Shell, Mr. Sanchez was required to purchase certain tools and equipment from the prior dealer. In addition, he bought gasoline, oil, and other products from such dealer. *419 The Observer Shell station was equipped with two 4,000 gallon gas tanks. When the gallonage in such tanks became low, it was Mr. Sanchez's practice to call Shell Oil and reorder a new tank-truck of gasoline. He was required to pay the driver cash for the gasoline upon delivery. The driver also accepted customer credit card receipts in payment for the gasoline. Between 1964 and 1969, Mr. Sanchez maintained a separate business bank account for the Observer Shell station. He hired Jose Perezmena to maintain the books of account for the business and to prepare the necessary tax returns. Mr. Perezmena's brother was the prior operator of the Observer Shell station, and Mr. Perezmena did the bookkeeping for his brother. Although he was not a certified public accountant in the United States, Mr. Perezmena had been a CPA in Cuba. He visited the station monthly. The petitioners provided him with daily gas sheets (containing meter readings from the gas pumps), bank statements, and expense receipts. From such information, Mr. Perezmena calculated gross receipts and expenditures for the Observer Shell station. Mrs. Barnhill was familiar with the recordkeeping requirements for the station *420 and assisted her husband in compiling the financial information for Mr. Perezmena. In late 1969, Shell Oil Company terminated its lease arrangement with Mr. Sanchez, and the station was closed.
In May 1966, the petitioners purchased an apartment building located at 211 Willow Avenue, Hoboken, N.J. (Willow apartments), for $10,500.00. They made a deposit of $1,000.00, paid $1,866.20 at closing, assumed a first mortgage of $4,500.00, and gave the seller a second mortgage of $3,000.00. The Willow apartments were located in a low-income area of Hoboken. The building consisted of 10 dwelling units. Although the petitioners purchased such building as an investment, they also resided in one of the units during 1966 and part of 1967. On their return for each year, the petitioners claimed a $10,500 basis for depreciating the Willow apartments and listed the following amounts for repairs: 1966
$566.20
1967
578.80
1968
440.00
1969
750.74
1970
1,324.00
Mrs. Barnhill handled the monthly bookkeeping for the Willow apartments. Although she deposited the rental receipts directly into the petitioners' personal checking account, she kept track of the amount of such *421 receipts through the use of a ledger. Each year, Mrs. Barnhill listed on such ledger the expenditures made by the petitioners with respect to the Willow apartments and presented such information to Mr. Perezmena. On October 4, 1967, the petitioners purchased a two-family home located at 8419 Liberty Avenue, North Bergen, N.J. (Liberty property), for $34,837.50. In order to finance such purchase, they obtained a $25,000.00 mortgage from the First National Bank of Jersey City, N.J. From October 1967 to November 1969, the petitioners lived together at the Liberty property. Nestor Martinez was the father of Mrs. Barnhill. Between 1962 and 1969, Mr. Martinez made numerous gifts to the petitioners. In addition to making cash gifts, he allowed them to live with him in Brooklyn for 2 years and paid certain doctor and hospital bills for them, including a $1,000 hospital bill in connection with the birth of their second child. In addition, he paid for certain home furnishings, including a refrigerator and a dishwasher. The petitioners used some of the money given to them by Mr. Martinez to pay household expenses. Mr. Martinez estimated the total amount of his gifts to be $12.495, *422 and he always considered such amounts to be gifts and never expected any repayment from the petitioners. Gilberto Bello was a friend of Mr. Sanchez. In 1969, Mr. Bello started a company known as Cahill Products Corp. (Cahill), which he ran together with his brother, Louis Bello. Cahill was in continuous financial difficulty from its inception. It had trouble meeting its weekly payroll and purchasing supplies and was forced to factor its accounts receivable and take out an inventory loan. On different occasions, in an attempt to keep Cahill afloat, Mr. Bello borrowed money from his mother and others. On several occasions, Cahill borrowed money from Mr. Sanchez to meet the payroll. Such loans were usually repaid to Mr. Sanchez the following week. During the first week of December 1969, Mr. Bello borrowed an additional $4,000 from Mr. Sanchez. From December 5, 1969, through June 25, 1970, Mr. Sanchez received 20 checks from Cahill (each in the amount of $150) in partial repayment of such loan. In August 1970, Cahill was forced into receivership by its creditors. Florence Davis was the bookkeeper and secretary for Cahill.In such capacity, she established the corporate books *423 of account and signed checks for the company. Ms. Davis executed two undated checks, each in the amount of $2,500, payable to Mr. Sanchez. On the back of such checks, Ms. Davis wrote the words "payment loan." Mr. Sanchez's signature appeared on the back of both such checks, but they were never negotiated. In late 1969, the petitioners decided to move to Florida. In preparation for such move, they paid off their mortgage on the Liberty property with a cashier's check, dated November 5, 1969, in the amount of $24,222.87. On November 28, 1969, the petitioners attended a closing on the sale of the Liberty property at the law offices of Miller & Giordano in Hoboken, N.J. The petitioners sold such property to Mr. and Mrs. Juan Suazo for $44,701.14. The petitioners received a deposit of $4,450.00, took back a purchase money mortgage of $32,500.00 (bearing interest of 7-1/2 percent), and received $7,751.14 at the closing. The $7,751.14 consisted of cash in the amount of $1,001.14 and a check in the amount of $6,750.00 drawn on the Chase Manhattan Bank. Under the terms of the mortgage, the Suazos agreed to repay the principal of $32,500.00 with interest be making monthly payments *424 to the petitioners of $240.18. Prior to attending the closing, Mrs. Barnhill prepared two documents. At the request of Mr. Sanchez, she prepared a document, which provided, in part: TO: Louis Sanchez FROM: Gilberto Bello RE: $15,000.00 Debt This is to certify, that I gilberto Bello, lent Louis Sanchez the sum of $15,000.00 on Nov. 1, 1969, no interest to be charged. Payment of the loan will be made during 1970 - 1975. Lender: Gilberto Bello Borrower: Louis Sanchez The other document provided, in part: TO: Nestor Martinez FROM: Louis/Margarita Sanchez RE: $15,000.00 Debt I, Louis/Margarita Sanchez, agree to reimburse Mr. Nestor Martinez for monies borrowed throughout the years 1963 - 1969, the sum being $15,000.00 with no interest to be charged. Payment will be made as soon as possible, with no time limit.
Lender: Nestor Martinez Borrower: Louis/Margarita Sanchez The petitioners obtained the signatures of Mr. Bello and Mr. Martinez on such documents and brought such documents to the closing. After the closing, Mr. Sanchez asked Mr. Giordano to notarize the documents, and Gemma Meyer, a secretary in the firm, notarized them. On or about December 1, 1969, the *425 petitioners moved to Orlando, Fla. Mr. Sanchez opened a gas station known as Lou's Shell Station, which was located at 6303 North Orange Blossom Trail, Orlando, Fla. Sometime around Christmas of 1969, Mrs. Barnhill went back to New York and spoke with Mr. Perezmena about tax matters. In January 1970, he prepared a financial statement for the petitioners, which set forth the following information with respect to the Observer Shell station: Profit and Loss Statement for the Twelve Months Ended December 31, 1969 Net Sales
$105,168.03
Beginning inventory
as of 1/1/69
$521.00
Purchases
77,481.63
78,002.63
Less inventory as
of 12/31/69
485.00
77,517.63
27,650.40
Operating expenses
Depreciation
317.49
Taxes
599.52
Rent
4,139.25
Repairs
1,034.03
Salaries and wages
5,707.62
Insurance
704.97
Legal and
Professional fees
335.00
Telephone
70.46
Plaid stamps
(advertising)
705.00
Electricity
493.63
Uniforms
95.00
Alarm system
115.62
Miscellaneous
1,206.95
15,524.54
Profit
12,125.86
On January 5, 1970, the petitioners applied for a loan in the amount of $15,000 to purchase a home in Florida. On such application, *426 they stated that Mr. Sanchez's income was $225 per week. In addition, they listed the Suazo mortgage as an asset and stated that they owned rental property in New Jersey. On March 1, 1970, the petitioners purchased a five-unit rental apartment located at 6927 Anoka Drive, Orlando, Fla. (the Anoka property), for $36,000.00. They made a deposit of $1,500.00, paid $23,072.62 at closing, and assumed an existing mortgage of $11,357.03. On March 27, 1970, the petitioners purchased a house at 5682 Altec Court, Orlando, Fla. (the Altec property), for $26,000. To finance such purchase, they secured a $15,000 loan from the Orlando Federal Savings and Loan. The balance of the purchase price was paid by the petitioners. In early 1970, Mr. Perezmena prepared the petitioners' Federal income tax return for 1969. Such return reflected the following items of income and expenses with respect to the Observer Shell station: Sales
$89,992.75
Cost of goods sold
84,133.16
Gross profit
$ 5,859.59
Less: expenses
Depreciation
Taxes on business
property
$1,327.06
Insurance
488.30
Legal and professional
fees
240.00
Stamps
1,000.00
Electricity
279.06
Laundry
138.22
Telephone
136.86
3,609.50
Net profit
$ 2,250.09
*427 On such return, the petitioners did not report their rental receipts from the Liberty property, nor did they report the sale of such property or interest income that they received from the Suazo mortgage. The address used on such return was 425 Newark, Hoboken, N.J., which was the address of the Observer Shell station. The petitioners reported the following receipts and expenses with respect to the Willow apartments: Receipts
$4,069.00
Repairs and expenses
2,379.02
Depreciation
525.00
Net income
$1,164.98
On December 23, 1970, the petitioners sold the Willow apartments to Dominic Ivacic for $21,500. They received a $2,000.00 deposit, $2,764.27 at closing, and a purchase money mortgage for $16,500.00. Under the terms of such mortgage, Mr. Ivacic agreed to repay the principal plus 8-percent interest by making payments in the amount of $200.02 each month for 121 months. Sometime after they moved to Orlando, the petitioners retained the Bookkeepers Business Service Company of Central Florida, Inc. (BBSC), to handle their bookkeeping and to prepare their tax returns.Charles C. Smith was the president and manager of BBSC. Under the direction of Mr. Smith, *428 BBSC performed the monthly bookkeeping for Lou's Shell, including the preparation of a ledger and a profit and loss statement. The profit and loss statements were based on the information furnished by the petitioners. Daily sales records were totaled, and expenses paid by the petitioners for operating expenses were subtracted. In the course of preparing the petitioners' income tax returns, it was BBSC's practice to require the petitioners to complete a personal information questionnaire setting forth any other income they received during the year. BBSC entered all of the information given to them in an input journal. Thereafter, such information was sent to the BBSC computer center for processing. Ultimately, BBSC utilized such information to prepare the petitioners' tax returns. Mrs. Barnhill assisted her husband in preparing and providing financial information to BBSC. On the petitioners' Federal income tax return for 1970, they reported the following items of income and expenses with respect to their service station: Gross receipts
$145,983
Cost of goods sold
126,111
Gross profit
$ 19,872
Expenses
15,291
Net profit
$ 4,581
The petitioners reported *429 that they had sold the Willow apartments and claimed depreciation of $525 with respect to such property (computed on a basis of $10,500).However, in their computation of the gain on the sale of such property, they listed "improvements" of $5,730 and claimed that such property had an adjusted basis of $17,927. During 1970, the Suazos forwarded monthly mortgage payments of $240.18 to the petitioners, but none of such amounts was reported on the petitioners' return for 1970. On or about February 15, 1971, the petitioners separated, and on February 26, 1971, they entered into an agreement whereby Mrs. Barnhill consented in part to transfer all of her interest in the Ivacic and Suazo mortgages to her husband. In turn, Mr. Sanchez agreed, in part, to pay for certain expenses of the children and to transfer his interest in the Anoka and Altec properties to his wife. On April 19, 1971, the petitioners were granted a divorce, and the provisions of the February 26, 1971, agreement were incorporated into the divorce decree. During 1971, Mr. Ivacic forwarded 12 monthly mortgage payments of $200.02, or $2,400.24, to Mr. Sanchez. Of such amount, $1,279.51 represented interest. In addition, *430 the Suazos forwarded monthly mortgage payments of $240.18 to the petitioners. By January 1, 1972, the Suazos had reduced the principal of their mortgage to $31,543.74 and had paid interest in the amount of $5,048.24. BBSC prepared Mr. Sanchez's Federal income tax return for 1971. In preparing the financial statements for Lou's Shell station for such year, BBSC discovered that the information furnished by Mr. Sanchez resulted in a net loss for 1971 in the amount of $1,812.28. Mr. Smith was not satisfied with such information and was of the opinion that Mr. Sanchez had improperly reported the amount of his income to him. He discussed such matter with Mr. Sanchez and told him that he did not believe that the station suffered a loss and refused to file a return using the information provided by Mr. Sanchez. Mr. Sanchez agreed to revise his income figures for such year. To reflect such agreement, BBSC increased the gross sales of $137,831 reported by Mr. Sanchez to $149,880. On his return for 1971, Mr. Sanchez reported net profit of $8,883 from the gas station and a loss of $2,111 from his used car business. He also reported a long-term capital gain of $313 with respect to *431 the Willow apartments based upon his receipt of $1,121 of principal on the Ivacic mortgage. However, Mr. Sanchez did not report any of the interest that he received from the Ivacic mortgage. In addition, Mr. Sanchez did not report any income with respect to the Suazo mortgage. In April 1972, Myra Johnson, an IRS tax auditor, contacted the petitioners and informed them that their return for 1970 was being examined. Mrs. Johnson asked the petitioners to come in and bring with them their books and records with respect to such year, including all records of their savings, investments, property acquired, loans, mortgages (principal and interest), and business and personal checking accounts for the period December 1969 through January 1971. At their initial interview with Mrs. Johnson, the petitioners informed her that they had borrowed $15,000 from Mr. Bello and $15,000 from Mr. Martinez and showed her the two "notes" to support their claim. They further informed Mrs. Johnson that they used the proceeds of such loans as downpayments on the Altec and Anoka properties. On June 8, 1972, the petitioners met again with Mrs. Johnson, and she questioned them further about the loans *432 from Mr. Bello and Mr. Martinez. At such time, the petitioners informed her that of the $15,000 received from Mr. Bello, $7,000 was received on December 2, 1969, that the remaining $8,000 was received by them at the end of December 1969, and that all of such amounts were in cash. With respect to the loan from Mr. Martinez, the petitioners informed Mrs. Johnson that all of the $15,000 was in a bank. Upon further specific questioning by Mrs. Johnson as to the bank in which such funds were deposited, the petitioners told her that they held $14,000 of such amount as cash on hand at the end of 1969. In July 1972, Mr. Sanchez was paid the balance of the mortgage from Mr. Suazo, which amounted to $31,432.05. Mr. Sanchez received a check in such amount from Jeanne P. Gallagher of the Trust Company of New Jersey (TNJ). Mr. Sanchez cashed such check, and thereafter, at his direction, TNJ issued three cashier's checks payable to the order of Lou Sanchez in the amounts of $10,000.00, $10,000.00, and $6,432.05.Mr. Sanchez endorsed all of such checks in blank. Robert Castro, his nephew, cashed the check for $6,432.05 at the First National Bank of Homestead, Fla., and delivered the cash *433 to Mr. Sanchez. Ippolitto Sanchez, the brother of Mr. Sanchez, took the two $10,000.00 checks, deposited such checks into his account at the Bank of San Juan, Bayaman, Puerto Rico, and gave $20,000.00 cash to Mr. Sanchez. In July 1972, Mrs. Johnson extended her examination to Mr. Sanchez's separate return for 1971, and on August 10, 1972, she discussed such return with him. During such meeting, Mr. Sanchez provided Mrs. Johnson with the telephone number of his father-in-law, Mr. Martinez. Thereafter, Mrs. Johnson called Mr. Martinez and discussed the November 28, 1969, "note" bearing his signature. Mr. Martinez informed Mrs. Johnson that he had given the petitioners money over the years but that such money had been repaid. On September 27, 1972, Mrs. Johnson telephoned Mr. Giordano and questioned him about the Bello and Martinez notes. Mr. Giordano informed her that he did not handle any loan transactions between the petitioners and Mr. Bello or Mr. Martinez. He informed Mrs. Johnson that he could only recall handling a property sale for the petitioners in preparation for their move to Florida. Thereafter, Mrs. Johnson referred the examination of the petitioners' income *434 tax returns for 1970 and 1971 to the Criminal Investigation Division of the IRS (CID). In the course of Mrs. Johnson's interviews with the petitioners, they never told her that they had received any loans from Robert Castro or Ippolitto Sanchez. In addition, the petitioners never informed her that they had owned a home on Liberty Avenue, that they had sold such home, that Mr. Sanchez was receiving monthly payments from Mr. Suazo with respect to such sale, or that the Suazo mortgage was in fact paid off in July 1972. After the petitioners' case was referred to CID, it was assigned to Special Agent Arnold Wendell Dixon. Calvin Barnlund, a revenue agent, assisted Agent Dixon in the investigation. Mr. Dixon took a statement from Mr. Sanchez which was tape recorded and in which Mr. Sanchez informed Mr. Dixon that he had not purchased or owned any property in New Jersey other than the Willow apartments, that he had lived at the Willow apartments for 3 or 4 years immediately prior to moving to Orlando, that neither he nor Mrs. Barnhill had ever rented a safe deposit box, and that at the end of 1969, he had $30,000 cash, which consisted of $15,000 borrowed from Mr. Martinez and $15,000 *435 borrowed from Mr. Bello. Of such amounts, he claimed that he used $24,000 to purchase the Altec and Anoka properties and $6,000 to open his Shell station in Orlando, Fla.
Mr. Sanchez told Mr. Dixon that he had brought some money with him from Cuba and that his father had sent him more money after he arrived in the United States. However, he stated that he had used such monies to open his service station in Hoboken. Mr. Sanchez also told Mr. Dixon that he kept all of his money in bank accounts, except for the $30,000 he borrowed from Mr. Martinez and Mr. Bello. Mr. Sanchez did not mention to Mr. Dixon that he had received any other loans. On October 16, 1973, Mr. Dixon met with Mr. Bello and secured a sworn affidavit from him. Such affidavit provided, in part: In approximately November of 1969, Luis M. Sanchez came to me and asked if I would sign a note stating that I had loaned him $15,000.00. I did not loan Mr. Sanchez this money but I did sign the note because he was a good friend of mine. The note was completely made out when Mr. Sanchez brought it to me. I signed the note but it was not notarized in my presence. During the first week of December 1969 I borrowed *436 approximately $4000.00 from Luis M. Sanchez. This money was being paid back at the rate of $150.00 per week during December of 1969 & year 1970. I also state that the statement made by me on April 30, 1973 was false. I made that statement then in the manner I did to try to help my friend Mr. Sanchez. On August 12, 1975, Mr. Bello gave another sworn statement to Assistant U.S. Attorney Harrison Slaughter concerning Mr. Sanchez. At such time, he reiterated that he had never loaned money to Mr. Sanchez and stated that, in fact, he borrowed money from Mr. Sanchez. When questioned about the "note" that he had executed, Mr. Bello declared: I asked him what was the idea of * * * [the note], and you know, he never gave me a straight answer. It was something about buying a house or something. In April 1976, Mr. Sanchez was indicted on three counts of willfully and knowingly attempting to evade and defeat a part of his income taxes for 1969 through 1971 in violation of section 7201. Mr. Sanchez pled guilty for 1971, and on July 19, 1976, a judgment was entered in the district court sentencing Mr. Sanchez to 90 days in jail and fining him $3,000. The counts for 1969 and *437 1970 were dismissed. In February 1977, Mr. Barnlund had a conference with the petitioners' attorney. At such conference, the petitioners claimed that they had $20,000 cash at the end of 1968, consisting of $15,000 from Cuba and $5,000 in savings. They also claimed that they had received loans from others than Mr. Bello and Mr. Martinez. In his notices of deficiency, the Commissioner determined through a net worth computation that the petitioners had unreported taxable income of $39,123.52 for 1969 and $25,529.12 for 1970 and that Mr. Sanchez had unreported taxable income of $21,686.86 for 1971. The Commissioner further determined that all or part of the underpayments of Federal income tax for each of the years was due to fraud on the part of Mr. Sanchez; he concedes that Mrs. Barnhill is not liable for the addition to tax for fraud. At trial, the Commissioner conceded that certain adjustments should be made in his computations; he now maintains that the following schedule reflects the petitioners' net worth and adjusted gross income for 1969 through 1971: 1968
1969
1970
1971
Total assets
$54,616.24
$72,056.24
$131,056.81
$83,212.47 Less: liabilities
26,643.97
2,014.00
33,048.42
1,976.00 Net worth
$27,972.27
$70,042.24
$ 98,458.39
$81,236.47 Less: net worth
of prior year
27,972.27
70,042.24
98,458.39 Increase
(Decrease) in
net worth
$42,069.97
$ 28,416.15
($17,221.92)
Adjustments
89.62
1,131.97
42,836.78 Adjusted gross
income as
corrected
$42,159.59
$ 29,548.12
$25,614.86 Less: adjusted
gross income
reported on
return
3,415.07
6,019.00
6,928.00 Understatement
of income
$38,744.52
$ 23,529.12
$18,686.86 *438 OPINION The first issue for decision is whether the petitioners understated their taxable income for 1969, 1970, and 1971. The petitioners accept most of the Commissioner's computations, but they maintain that certain adjustments should be made in those computations. As to those adjustments, the petitioners have the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure[2]; Welch v. Helvering,290 U.S. 111 (1933); Moriarty v. Commissioner,18 T.C. 327 (1952), affd. per curiam 208 F. 2d 43 (D.C. Cir. 1953). Mr. Sanchez maintains that on January 1, 1969, he had $26,000 cash on hand rather than the $500 allowed by the Commissioner in the net worth computation. He claims that such amount consisted of money he brought from Cuba together with certain other monies. Mr. Sanchez argues that he distrusted banks and kept such money wrapped in meat paper and hidden in his freezer. The petitioners' claim is a common *439 one in cases of this type. In Holland v. United States,348 U.S. 121, 127 (1954), the Supreme Court referred to the claim of opening cash on hand as a "favorite defense." See also Friedberg v. United States,348 U.S. 142 (1954); Cefalu v. Commissioner,276 F. 2d 122, 127 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Boyett v. Commissioner,204 F. 2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. However, the Supreme Court also recognized that "the correctness of the result depends entirely upon the inclusion in * * * [opening net worth] of all assets on hand at the outset." 348 U.S. at 132.We must therefore never take lightly a taxpayer's contention as to an opening cash accumulation. The Commissioner points out that the cash hoard explanation was raised for the first time in 1977, 5 years after the initial audit and after the completion of the criminal case against Mr. Sanchez. He questions why such defense was not raise earlier and maintains that the petitioners' explanation is only the latest in a series of shifting stories designed to conceal the understatement *440 of taxable income. He further asserts that the petitioners have consistently ignored their expenditures in their assertion of a cash hoard, and concludes that if the petitioners had any cash accumulation, it was fully exhausted prior to 1969. The record is replete with inconsistencies which, when considered together, inescapably lead us to the conclusion that the petitioners have failed to prove that they had a cash accumulation at the end of 1968. We will summarize the arguments and evidence that have led us to our conclusion. The testimony of the petitioners' witnesses was substantially consistent as to the fact that there was, at one time, some cash accumulation. Mr. Sanchez testified at trial that he had $26,000 in cash, consisting of $14,000 which he brought from Cuba in 1959 and $12,000 which he received from his sister, Alejandrina Ciebeiro. Mrs. Ciebeiro corroborated the fact that in 1963 she had given Mr. Sanchez approximately $12,000. Robert Castro testified that at one time, Mr. Sanchez kept a package of cash in his freezer and that Mr. Sanchez entrusted such package to him for safekeeping on several occasions. However, Mr. Castro did not know whether Mr. Sanchez *441 still had such money in 1967, 1968, or 1969. Nonetheless, this Court is not bound to accept testimony at face value, even if uncontroverted, if it is inherently improbable or manifestly unreasonable. Quock Ting v. United States,140 U.S. 417, 420-421 (1891); Archer v. Commissioner,227 F. 2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Boyett v. Commissioner,supra. The petitioner maintains that he stored cash in his freezer because he distrusted banks. Yet, he deposited his cash wedding gifts in a bank and maintained a business bank account and a safe deposit box. Furthermore, the petitioner's present claim is inconsistent with the statements which he made in 1964 on his application for a Shell Oil dealership. On such application, he stated that he had $300 cash on hand and two bank accounts containing a total of $4,820. He claimed a total net worth of $8,170 and indicated that he could raise up to $3,000 of additional capital from his father-in-law.The petitioner gave no satisfactory explanation of how he arrived at the $3,000 amount, or of why he did not disclose the existence of his cash hoard *442 on such application.We are not convinced by Mr. Sanchez's explanation that he only reported the minimum amount necessary to secure a dealership. At trial, Mrs. Barnhill testified that Mr. Sanchez desperately wanted to go into business for himself. In her words: "He wanted that opportunity to prove himself rather than work for $60 a week pressing. And his first love has been automobiles and working on automobiles." In his testimony, Mr. Sanchez said: I don't want to tell nobody how much money I brought in from Cuba. I don't want to tell you how much money I got in my pocket right now. I don't have to tell nobody nothing about that. Such testimony causes us to wonder when we can believe Mr. Sanchez's statements, and his failure to assert on the application that he possessed substantial cash assets casts further doubt on his present claim. We are also persuaded by the Commissioner's argument that the petitioners' lifestyle in the early 1960s was somewhat inconsistent with the existence of any large cash accumulation. The fact that the petitioners lived at the home of Mr. Martinez and accepted numerous gifts of cash and other necessities from him indicates that they were struggling *443 to make ends meet.Mr. Martinez testified unequivocally that he never loaned the petitioners money, but gave them everything they needed over the years. In connection with the criminal investigation of Mr. Sanchez, Mr. Martinez compiled a list of such gifts, which included such items as a refrigerator, a washer, and a TV set. Mr. Martinez also made cash gifts to the petitioners over the years and paid for certain of their medical bills. Certainly, love and affection formed the basis for such generosity. However, we doubt that the petitioners would have had to accept the quantum of relief provided by Mr. Martinez if they in fact possessed a large cash accumulation. Furthermore, we view with a jaundiced eye Mr. Sanchez's claim that he kept a large cash accumulation in the freezer, wrapped in meat paper. Notwithstanding that Mr. Castro also testified as to the existence and location of such accumulation, Mrs. Barnhill was unable to corroborate the location of the cash, stating only that she once saw money "in an air vent." Certainly, Mrs. Barnhill would be most acquainted with the contents of her own freezer, and the fact that her testimony on this issue was inconsistent with *444 the testimony of Mr. Sanchez is a further indication that no such accumulation existed. In addition, Mr. Sanchez's claim with respect to the cash hoard has varied over the years. In 1973, he informed Mr. Dixon that he had brought some money with him from Cuba and that his father had sent him some additional money, but that he had used such monies to open his service station in Hoboken. He also informed Mr. Dixon that he kept all of his money in bank accounts. By 1977, his story had changed; in the conference with Agent Barnlund, Mr. Sanchez's counsel asserted that at the end of 1968, the petitioner had a cash hoard of $20,000, $15,00 which he had brought from Cuba and $5,000 of accumulated savings. No mention was made of any additional monies from Mrs. Ciebeiro. It is also very significant that the petitioner never asserted the claim of a cash hoard during the pendency of the criminal case when such claim might have avoided his criminal conviction. Cf. United States v. Shields,571 F. 2d 1115, 1118-1119 (9th Cir. 1978). [3] Not until the trial of this case did Mr. Sanchez's claim of a cash hoard take its present form. *445 Finally, the record also shows that the petitioners made substantial expenditures between 1963 and 1968. During such period, they started the Observer Shell station in Hoboken, purchased the Willow apartments, and purchased the Liberty property. By the petitioners' own account, such expenditures required cash outlays in excess of $30,000. While it is not clear where the petitioners obtained the funds for such expenditures, it is certainly possible that they were made from funds in the cash accumulation. Thus, even if we accept the fact that there was a cash accumulation, there exists a distinct possibility that the funds in such accumulation were depleted by the end of 1968. Accordingly, we conclude that the petitioners have failed to prove that they had a cash accumulation at the end of 1968, and we sustain the Commissioner's determination on this matter. See, generally, Cefalu v. Commissioner,276 F. 2d at 127 and cases cited therein. The petitioners also contend that the Commissioner erred in failing to take into account certain monies received by them from Shell in late 1969 for the sale of their inventory. We disagree. An explanation of the background *446 of the petitioners' inventory claim is in order. In their petition, the petitioners maintained that they received $3,500 from the sale of such inventory. However, sometime prior to trial, they increased the alleged proceeds of the sale to $6,750. As evidence of such amount, they presented to the Commissioner a deposit slip from the Pine Hills First National Bank and indicated that such amount was deposited therein. At trial, the Commissioner introduced the deposit slip, and Mr. Sanchez asserted that such slip evidenced the deposit of the money he received from the inventory. Thereafter, the Commissioner showed Mr. Sanchez a copy of the November 28, 1969, closing statement for the Liberty property. Such statement specifically indicated that the Suazos gave the petitioners a check (No. 536089) in the amount of $6,750 from the Chase Manhattan Bank. The Commissioner then introduced a copy of that check, which had been deposited by the petitioners in the Pine Hills First National Bank. The petitioners also attempted to support their inventory claim by asserting that at the beginning of 1969, they had an inventory of $6,300. Apparently, they reached such conclusion by dividing their *447 cost of goods sold for 1968 by twelve. Such argument was not repeated on brief; instead, the petitioners now maintain that they received $6,300 on the sale of their inventory in late 1969. In our view, the petitioners have wholly failed to prove any of their inventory claims. Although it is likely that their gas station had some inventory on hand at the end of 1968, the petitioners have wholly failed to prove the amount of such inventory. No competent evidence was introduced to support their claim that such inventory amounted to $6,300. Indeed, the only documentary evidence in the record with respect to such matter consists of the petitioners' returns for 1968 and 1969, and on both of these returns, the inventory figure was zero. Accordingly, we cannot sustain the petitioners' claim with respect to the 1969 opening inventory. Similarly, we reject the petitioners' assertion that they received $6,300 from Shell Oil in late 1969. It appears that such claim is merely a variation of their $6,750 claim, which was shown by the Commissioner to be patently false. We need not adjudicate the petitioners' claim merely on their failure of proof. We find particularly illuminative a letter *448 from Shell Oil indicating that it had repurchased from Mr. Sanchez $257.04 of Shell products, a rotary sign for $10.00, and $176.56 of credit card invoices. However, such letter indicated that Shell's records did not show whether such amounts were refunded to Mr. Sanchez or whether the amounts were applied to monies owed to them by Mr. Sanchez. Under such circumstances, we cannot conclude that the petitioners received any money from Shell at the end of 1969.
Moreover, we are not persuaded by the petitioners' argument that they were paid separately for their gasoline.Mrs. Barnhill testified that there was a problem with water in the tanks and that Shell decided to close their station rather than install new tanks. Since the petitioners knew that Shell intended to close the station, it is questionble that they would have continued to purchase additional gasoline. Rather, it is likely that they sold their remaining gasoline, together with as much of their other inventory as they could, before closing the station and moving to Florida. In short, we conclude that the petitioners have wholly failed to prove any error in the Commissioner's determination with respect to their claim *449 of an inventory. The petitioners next contend that they made capital improvements to the Willow apartments prior to January 1, 1969. They maintain that they spent $5,730 to restore the property and conclude that such amount should be added to their basis in such property for the purpose of increasing their opening net worth. The Commissioner argues that the petitioners did not incur capital expenditures with respect to such property. Alternatively, he maintains that the petitioners expensed such items currently as repairs. The petitioners have the burden of proving the amount and character of their claimed expenditures. Rule 142(a); Welch v. Helvering,supra.
The petitioners testified that they made certain improvements to the Willow apartments. However, such testimony was nebulous, was not specific, and was unsupported by corroborating evidence. Furthermore, their returns for such years do not indicate either that they incurred any capital expenditures with respect to such propety, or that they incurred expenditures which were improperly expensed. Their returns *450 for 1966 through 1968 listed repairs of $566.20, $578.80, and $440.00, respectively, and during such years, they claimed depreciation on a basis of $10,500.00. Indeed, the only supporting evidence in the record is their return for 1970, where, for the first time, the petitioners reported $5,730.00 of improvements on the Willow apartments. However, such claim was reported in connection with the sale of such property, was unsupported by any other information, and had the effect of decreasing the gain on the sale of such property. We view the claim of improvements on the 1970 return as unconvincing for a number of reasons. First, the petitioners have offered no other evidence supporting such amount. Second, even if such expenditures were incurred, the petitioners introduced no evidence to prove either that the expenditures were capital in nature or that they were incurred prior to January 1, 1969. While it may be that the petitioners did incur some expenditures prior to January 1, 1969, which were capital in nature, they have wholly failed to provide this Court with any basis for determining the amount and timing of such expenditures. Cf. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). *451 A muddled series of vague recollections, unsupported by corroborating evidence, simply will not suffice. Archer v. Commissioner,supra.Accordingly, we sustain the Commissioner's determination on this matter. The petitioners next contend that R. Sanchez borrowed $15,000 from Mr. Bello and that the Commissioner erred in failing to take such loan into account as a contaxable source of cash in his net worth computation.The Commissioner argues that Mr. Sanchez did not borrow money from Mr. Bello; rather, he argues that Mr. Sanchez loaned money to Mr. Bello. The petitioners have the burden of disproving the Commissioner's determination with respect to such matter. Rule 142(a); Welch v. Helvering,supra.
The petitioners' account of this matter is somewhat complex and has changed a number of times over the years. Originally, they contended that they received $15,000 from Mr. Bello in late 1969. They told Mrs. Johnson that they received such amount in two installments: $7,000 in November 1969 and $8,000 before the end of that year. However, in their *452 petition, the petitioners asserted that they received the full $15,000 in 1970. Currently, they maintain that they received $7,000 in November 1969, an additional $5,000 by December 31, 1969, and the remaining $3,000 by way of 20 checks, each in the amount of $150. The petitioners introduced a document purporting to represent a $15,000 loan from Mr. Bello to Mr. Sanchez. They also introduced two undated checks from Cahill, each in the amount of $2,500. Mr. Sanchez testified that he turned such checks over to Mr. Bello in late 1969 in exchange for the $5,000 portion of the loan. However, he also testified that he had subsequently secured such checks from Mr. Bello as evidence in this case, that he had not yet repaid any of the money he had "borrowed" from Mr. Bello, and that he did not intend to do so until he straightened out his tax matters. This Court need not accept the testimony of a witness which is highly improbable or manifestly unreasonable. Quock Ting v. United States,supra. In our view, the evidence is overwhelming that Mr. Sanchez did not borrow any money from Mr. Bello in late 1969 or 1970. The Commissioner introduced the testimony *453 of Florence Davis, who was the bookkeeper for Cahill. Mrs. Davis was intimately acquainted with the financial position of Cahill and described such position as "extremely bad." She testified that neither Cahill nor Mr. Bello had the financial resources to loan Mr. Sanchez money. She identified the two undated checks relied on by the petitioners and stated that she had written such checks. She indicated that it was Cahill's practice to issue undated checks when it had insufficient funds to pay its debts currently. She also testified that she had written the words "payment loan" on such checks and stated that such words indicated that Cahill wrote such checks for the purpose of paying off a loan. The statements of Mr. Bello are also enlightening. Mr. Bello was not available to testify as a witness. After establishing his unavailability under Rule 804(a)(5), Federal Rules of Evidence (FRE), the Commissioner introduced two sworn statements of Mr. Bello which were executed in 1973 and 1975 in connection with the criminal investigation of Mr. Sanchez. Therein, Mr. Bello admitted that he had lied to the Internal Revenue Service about such transaction. He stated that he had not *454 loaned money to Mr. Sanchez and that he had executed the purported loan document at the request of Mr. Sanchez. He further stated that he had borrowed $4,000 from Mr. Sanchez which was being repaid in $150 installments. By making such statements, Mr. Bello subjected himself to the possibility of criminal prosecution under section 7206. See Rule 804(b)(3), FRE. In view of that possibility, we found his statements to be properly admissible as statements against interest. Based on these statements, together with the other evidence, we conclude that there is no merit in the petitioner's argument that Mr. Bello loaned him $15,000. On the other hand, the evidence is clear that Mr. Sanchez loaned $4,000 to Mr. Bello. Accordingly, we sustain the Commissioner's determination on this matter. The petitioners also argue that they received two loans in 1970 which were not taken into account by the Commissioner in his net worth computation. They maintain that Mr. Sanchez borrowed $2,000 from Robert Castro and $2,500 from Ippolitto Sanchez and that he repaid such loans when the Suazo mortgage was retired in July 1972. The Commissioner argues that no such loans existed; he suggests that *455 the petitioners' claim with respect to such loans are merely attempts to provide a rational explanation for actions by Mr. Sanchez designed to conceal the receipt of income from the sale of the Liberty property. The petitioners have the burden of proving the existence and amount of such loans. Rule 142(a); Welch v. Helvering,supra.
At trial, both Robert Castro and Ippolitto Sanchez were called to testify with respect to such loans. Both men testified that they had loaned money to the petitioner in 1970, and both men stated that they were repaid by the petitioner in 1972. Nonetheless, the circumstances surrounding the creation and repayment of such loans cast grave doubt upon the testimony of these two witnesses, and the Court is not bound to accept such testimony at face value. Archer v. Commissioner,supra.
In April 1972, Mrs. Johnson began an investigation of the petitioners' return for 1970. At such time, the petitioners made no mention of the Liberty property to her. Similarly, they did not disclose to her that they were receiving *456 income from the mortgage on such property. When Mrs. Johnson asked the petitioners about the existence of any loans that they then had outstanding, the petitioners immediately presented her with two notarized documents: the Bello "note" and a $15,000 note purporting to acknowledge the existence of a debt from the petitioners to Mr. Martinez. The petitioners did not inform Mrs. Johnson of any other loans. Similarly, they made no mention of any other loans to Mr. Dixon. At trial, Mr. Sanchez testified that he did not inform Mrs. Johnson or Mr. Dixon of the loans from his nephew or his brother because such loans were family loans. Yet, he told Mrs. Johnson that he borrowed $15,000 from his father-in-law and presented her with a notarized document purporting to evidence such a loan. Therefore, we are not convinced that the petitioners' failure to mention ordocument the existence of these loans resulted from their familial nature. Furthermore, the IRS examination of the petitioners continued throughout July 1972, and during such month, Mr. Sanchez received over $31,000 from the Suazos, representing the balance of the mortgage on the Liberty property. The petitioners *457 never disclosed the receipt of such amount to the IRS. Instead, Mr. Sanchez brought the cashier's check he received to the bank on which it was drawn and exchanged such check for three other cashier's checks and $5,000 cash. Thereafter, he endorsed such checks, gave two of them to his brother, who deposited them in Puerto Rico, and gave the third check to his nephew, who cashed such check in Homestead, Fla. Both Ippolitto Sanchez and Robert Castro gave the petitioners cash for such checks. Mr. Sanchez attempted to explain his reasons for such transactions. He maintained that he used such checks as vehicles for the repayment of the loans he had outstanding with his brother and nephew. He asserted that he exchanged the cashier's check for three other checks and cash in order to pay off his loans quickly. However, we find such explanation to be unconvincing. Mr. Sanchez could have achieved the same result without having his brother and nephew cash such checks for him and give him the cash. The $5,000 cash that he received when he exchanged the initial cashier's check was more than enough to repay both of such "loans." The fact that the petitioners made no mention of such transactions *458 to the IRS in 1972 strongly convinces us that no such loans existed, and the trial testimony of the petitioners' witnesses with respect to such issue does not show otherwise. Quock Ting v. United States,supra.We conclude that the petitioners have failed to prove that they received any loans from Robert Castro or Ippolitto Sanchez.Accordingly, after having reviewed all the adjustments that are in dispute, we sustain the Commissioner's determination of the deficiencies. The next issue for decision is whether any part of the underpayment of taxes for 1969 and 1970 was due to fraud on the part of Mr. Sanchez. The petitioner has conceded that his plea of guilty to tax evasion under section 7201 for 1971 collaterally estops him from denying that part of his underpayment of tax for that year was due to fraud within the meaning of section 6653(b). Plunkett v. Commissioner,465 F. 2d 299 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 74-76 (1964); see also Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964). *459 Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F. 2d 651 (3d Cir. 1974); Estate of Temple v. Commissioner,67 T.C. 143 (1976). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal; mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question *460 to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct must be examined to establish circumstantially the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106; Arlette Coat Co. v. Commissioner,14 T.C. 751, 756 (1950). The evidence overwhelmingly establishes that Mr. Sanchez fraudulently underpaid his taxes during each of the years in issue. He arranged for the preparation of the tax returns, and those returns understated taxable income by $38,744.52 in 1969, $23,529.12 in 1970, and $18,686.86 in 1971. Such a consistent pattern of underreporting substantial amounts of income, over a period of several years, standing *461 alone, is persuasive evidence of fraud. Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Merrit v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. See also Harper v. Commissioner,54 T.C. 1121, 1139 (1970) and cases cited therein. We fully recognize that such principle should be applied with caution where the finding of unreported income is based upon a taxpayer's failure to meet his burden of proof. Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. at 106. However, our finding of fraud is not based on the petitioner's failure of proof. There is a considerable amount of other evidence indicating that Mr. Sanchez intentionally understated his income and undertook a specific course of conduct with the intent to conceal such income, thereby evading the payment of taxes. The petitioner asserts that he had no formal *462 training in accounting and that he relied fully on his accountants to prepare his books and returns. He claims that he disclosed all of his income to such accountants and that he did not examine his returns before signing them. Thus, he claims that the omissions on such returns were innocent and not fraudulent. It is true that a taxpayer's reliance on an accountant to prepare his income tax returns may indicate an absence of fraudulent intent. Marinzulich v. Commissioner,31 T.C. 487 (1958). However, reliance on others to prepare one's income tax returns is not an acceptable defense if the taxpayer has failed to supply all necessary information to such accountant. Foster v. Commissioner,391 F. 2d 727 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; Estate of Temple v. Commissioner,67 T.C. at 162-163; Green v. Commissioner,11 B.T.A. 278, 279 (1928). The petitioner's accountants were both unable to testify at trial due to severe illness. However, they gave statements to the IRS describing *463 their dealings with Mr. Sanchez. The parties have stipulated that such statements reflect the testimony the accountants would have given had they appeared at the trial. Mr. Perezmena indicated that Mr. Sanchez provided him with the figures for the preparation of the 1969 financial statement and explained that the petitioner's 1969 return differed from the financial statement because Mr. Sanchez told him that certain deposits did not constitute taxable income. Similarly, Mr. Smith indicated that BBSC depended entirely on the information furnished by their clients. BBSC required their clients to complete a questionnaire indicating all of their other income. On at least two or three occasions, Mr. Smith specifically informed Mr. Sanchez that he was dissatisfied with the information provided by him, and that he did not believe that such information was correct. In fact, Mr. Smith ultimately refused to file the petitioner's 1971 return with the information as furnished and did not file such return until after the petitioner had agreed to increase his gross receipts. Under these circumstances, we believe it is clear that the petitioner was selective about the information he gave *464 to his accountants and that such selectivity resulted in an underreporting of taxable income with the intent to evade tax. See Cefalu v. Commissioner,supra;Estate of Temple v. Commissioner,supra.
We are also convinced that the petitioners intended to conceal the existence of the Liberty property during each of the years in issue.They received rental income from such property and properly reported it on their 1968 return. However, they failed to report such income on their 1969 return. In addition, the return failed to report that they had sold such property at a gain, or that they were receiving interest income on the mortgage with respect to such sale. The address listed on the return for 1969 was that of the Shell station in Hoboken. The petitioners had never used such address in the past for filing their return and had moved to Florida at the time of the filing of the 1969 return. The information on the 1969 return, when coupled with the execution of the Bello and Martinez loan documents, strongly convinces us that the petitioners intended to conceal the sale of such property. The petitioner's actions and representations *465 with respect to the Bello and Martinez "notes" are further evidence of fraud. We are not convinced that the petitioner needed cash in excess of what he possessed at the end of 1969 or that he borrowed any money from his relatives in order to meet such need. The Bello loan has already been shown to be patently false; Mr. Sanchez never borrowed any money from Mr. Bello. In fact, he loaned money to Mr. Bello, and Mr. Bello specifically stated that he signed the "note" only because Mr. Sanchez had asked him to do so. It appears to us that the petitioner executed such note because he knew it would be useful to explain any questions that might arise about the source of his funds. The petitioner's claim with respect to the Martinez note is more complex. He no longer claims such note evidenced a specific debt, but in an attempt to explain his reason for arranging for the execution of such note, he claims that such note was merely an "acknowledgment" of the gifts Mr. Martinez had given to the petitioners over the years. The petitioner maintains that he was having marital problems, and that he signed such acknowledgment at the request of his wife to provide her with financial security *466 in the event of a divorce.Such claim was substantially corroborated at trial by Mrs. Barnhill and Mr. Martinez. Nonetheless, we find such claim to be self-serving and wholly without merit. The Martinez loan document lists both Mr. Sanchez and Mrs. Barnhill as obligors, was unconditional on its face, and purported to evidence an obligation to pay Mr. Martinez (not Mrs. Barnhill) $15,000 for monies "borrowed." After their divorce, the petitioners brought such document to Mrs. Johnson and used it to show that they both had borrowed $15,000 from Mr. Martinez and had used such money for a downpayment on properties in Florida. Mr. Sanchez also told the same story to Mr. Dixon. Unfortunately for petitioners, when Mrs. Johnson spoke with Mr. Martinez, he stated that he had not loaned money to the petitioners, but had given them the money. Since it is clear that Mr. Martinez never loaned any money to the petitioners, it follows that the petitioners prepared such note in 1969 with the intent to evidence a fictitious debt. The fact that Mr. Sanchez has now abandoned such claim shows only that he realizes the futility of his position.It does not make his prior actions and *467 representations with respect to such note any the less fraudulent. [4]
Finally, the petitioner's false and misleading statements to the IRS in the course of the examination convince us that his understatements of taxable income were due to fraud. United States v. Newman,468 F. 2d 791, 794 (5th Cir. 1972); Gajewski v. Commissioner,67 T.C. at 200; McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F. 2d 1121, 1126 (5th Cir. 1975).He attempted to explain his sources of cash to Mrs. Johnson and Mr. Dixon by telling them that he had borrowed money from Mr. Bello and his father-in-law; he told Mr. Dixon that he never owned any property in New Jersey other than the Willow apartments, and that he had lived there for 3 to 4 years prior to moving to Florida; he told Mr. Barnlund that he had a cash hoard and that he had received loans from his nephew and his brother. He also told the IRS that he had received $6,750 from Shell Oil for the sale of inventory.All these stories have been *468 shown to be patently false. In our view, the petitioner's conduct clearly reveals a pattern of furtive behavior designed to conceal his receipt of taxable income and hence avoid the payment of taxes which he knew to be owing. His substantial underreporting of income, his failure to offer any plausible explanation for such underreporting, and his deceptive conduct throughout the investigation and at trial, all clearly demonstrate that the underpayments of tax were due to fraud. Consequently, we hold that the Commissioner has proven, by clear and convincing evidence, that some part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b). The next issue for decision is whether the assessment and collection of deficiencies for each of the years in issue are barred by the statute of limitations. Since the Commissioner has sustained his burden of proving fraud for each year, the statute of limitations remains open under section 6501(c)(1). Estate of Temple v. Commissioner,67 T.C. at 159-160; Harper v. Commissioner,54 T.C. at 1142. The last issue for decision is whether Mrs. Barnhill is entitled to be *469 relieved of liabilities for the deficiencies for 1969 and 1970 as an innocent spouse within the meaning of section 6013(e). Such section provides: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including *470 interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. In order to obtain the benefit of such statute, a putative innocent spouse bears the burden of proving that all three of the conditions of section 6013(e)(1) have been met. Rule 142(a); Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). However, after considering all the evidence, we find that Mrs. Barnhill fails to meet the requirements of section 6013(e)(1)(B) and, accordingly, is not eligible for relief under such section as an innocent spouse for either 1969 or 1970. To satisfy the requirements of section 6013(e)(1)(B), a spouse must prove that she did not have actual knowledge of the omission of income and that she had no reason to know of the omission.See Adams v. Commissioner,60 T.C. 300 (1973); Sonnenborn v. Commissioner,supra. *471 To show that she had no reason to know of the omission, she must show the Court that a reasonably prudent person with her knowledge of the surrounding circumstances would not have known of the omission. Sanders v. United States,509 F. 2d 162, 166 (5th Cir. 1975). Where the facts of a transaction are in the possession of the spouse, or reasonably within her reach, her lack of knowledge of the legal tax consequences of a transaction is insufficient to base a claim for relief under section 6013. McCoy v. Commissioner,57 T.C. 732, 734 (1972); see also Quinn v. Commissioner,524 F. 2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Smith v. Commissioner,70 T.C. 651, 673 (1978). Furthermore, "a spouse cannot close her eyes to * * * facts, that might give her reason to know of the unreported income." Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 699 (1972). During the years in issue, Mrs. Barnhill played an active role in the financial affairs of the family. Both the Liberty and Willow properties were held jointly *472 with Mr. Sanchez, and she kept the books and records with respect to such properties. In addition, she assisted Mr. Sanchez with the bookkeeping for both the Observer Shell station and Lou's Shell and provided much financial information to the accountants each year. Mrs. Barnhill is an intelligent person, and we believe that she had reason to know that certain items of income were not reported on their returns for 1969 and 1970 ( Sanders v. United States,supra), especially when she claims to have known such items were taxable. Moreover, Mrs. Barnhill has failed to prove that she satisfies the requirement of section 6013(e)(1)(C). To meet that requirement, she must show that it would be inequitable to hold her liable for the deficiencies for 1969 and 1970. Based on this record, we can perceive no inequity in holding her liable for the deficiencies for such years. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. All references to a Rule are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Olive v. Commissioner,T.C. Memo. 1983-195↩.
4. See Day v. Commissioner,T.C. Memo. 1965-326; Helvey v. Commissioner,T.C. Memo. 1956-123↩.